# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  56561-7-II |
| Respondent, | |
| v. | |
| DONNY ROY ELLIOTT, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Donny R. Elliott appeals his convictions following a jury trial.  As a result of an assault that occurred in July 2021, Elliott was convicted of second degree assault, felony harassment—threat to kill, and unlawful imprisonment.  Elliott was also convicted of one count of violation of a court order for sending text messages on April 28, 2021, while a no-contact order was in place.  Before trial, Elliott moved to sever the violation of a court order charge from the other charges, which the trial court denied.  Following the testimony, Elliott's counsel failed to renew the motion as required by the criminal rules.

Elliott argues the trial court erred in denying his motion to sever and asserts that he received ineffective assistance of counsel due to his counsel's failure to renew the motion to sever.  We affirm Elliott's convictions.

FACTS

I. BACKGROUND

Elliott was previously in a relationship with Jacqueline Brager, and the pair have two children together, a minor daughter, B., and an adult son, Connor. At the time of the assault, B. was about nine years old.

The relationship between Elliott and Brager was rocky, causing Brager to obtain a no-contact order against Elliott. On April 28, 2021, despite the existence of a no-contact order, Elliott sent multiple text messages to Brager.

About three months later, in July of 2021, Elliott assaulted Brager. Elliott grabbed Brager by the throat, pulled her into his basement from outside, threatened her life, and forced her to stay and cook for him. Brager did not report the incident to police until a few months later, in September 2021.

Elliott was charged with second degree assault (count I), felony harassment—threat to kill (count II), unlawful imprisonment (count III), and violation of a court order (count IV). The violation of the court order charge was tied to the text messages Elliott sent to Brager on April 28. All of Elliott's charges included the allegation that Brager was an intimate partner, making each a domestic violence charge.

II. PRETRIAL

Elliott's case proceeded to a jury trial. Before the trial began, the parties stipulated that Elliott had two previous convictions for violating court orders. Elliott's counsel then moved to sever count IV from the others, arguing that the April 28 text messages would be overly prejudicial to Elliott's other charges.

In response, the State explained the content of the text messages as "[Elliott] . . . swear[ing] at [Brager]" and then making "a string of unresponded to apologies about his bad mood." Verbatim Rep. of Proc. (VRP) at 91. The trial court observed that the reasonableness of Brager's fear would be at issue for the felony harassment charge and questioned whether the text messages would apply to those facts. The State answered that the messages "demonstrate a convincing hostility by Mr. Elliott towards Ms. Brager" and show Elliott's "eruptive behavior." VRP at 92.

The trial court denied Elliott's motion to sever, explaining that the text messages were "related enough" and would be relevant to the harassment charge and Brager's fear. VRP at 93. The trial court stated, "I find that [on] balance . . . it's appropriate that the State be able to proceed with this April 28th charge as alleged in Count [IV]." VRP at 93.

## III. ELLIOTT'S TRIAL

At trial, Brager testified against Elliott. She testified that over one weekend in July 2021, B. was going to stay with Elliott at his home. Before then, Elliott and B. had previously not had much contact.

With B. already at Elliott's house for the weekend, Brager arrived around 11:00 a.m. on Saturday morning. Also present at the home was Elliott's young son from a different mother. Once Brager arrived, all four, Elliott, Brager, B., and Elliott's other son, went to a nearby river.

When they returned from the river, Elliott and Brager began arguing about their adult son, Connor. At that point, B. told Brager that she did not want to stay with Elliott as initially planned, and B. went inside of Elliott's house to gather her belongings. Elliott and Brager remained outside of the house, arguing.

3

Brager testified that Elliott followed her to her car as she prepared to leave with B. Elliott was angry and blamed Brager for B. wanting to leave his house. Elliott reached through Brager's open car window and grabbed Brager's face and neck while she was in the driver's seat. As Brager rolled up her window to protect herself from Elliott, B. came back outside toward the car. B. entered the car from the back-passenger door, but Elliott followed B. to get into the car. Elliott tried grabbing Brager's neck again from the back seat with one of his feet hanging out of a car door. When Brager began backing her car up, Elliott grabbed Brager's keys from the ignition, effectively stopping the car. With the car stopped, Elliott grabbed Brager's neck again, restricting her ability to breathe. B. was still in the vehicle, yelling.

At some point, the assault moved from the car to Elliott's front yard. B. and Elliott's other son were yelling in the front yard, and Elliott told them to "shut up" because someone was going to hear them. VRP at 140.

Brager testified that Elliott then pulled her into his basement by her throat, with B. and Elliott's son following them. Elliott put Brager up against a wall with his hands around her throat and squeezed. Brager stated that she could not breathe or scream. Brager felt like she was going to pass out and could hear the children yelling.

Elliott finally let go. Brager fell to the floor and B. ran to be beside her. Elliott then hit Brager on the side of the head, and when B. screamed, he hit B. too. At some point, Elliott held a blade-like woodworking tool and told Brager he was going to kill her with it. Brager testified she believed Elliott's threat.

Elliott then commanded Brager to get up and go upstairs, pulling her by her neck and then by her shirt. Brager stated she was afraid for her life but did not think she was able to leave Elliott's

house.  Once upstairs, Elliott eventually demanded that Brager "fix him dinner."  VRP at 149. Elliott would not let Brager use the restroom alone or drink anything unless it was alcohol.

Eventually, around 5:00 in the evening, Elliott laid on his bed with his son.  Brager and B. laid on another bed nearby.  Elliott intermittently fell asleep and would call Brager's and B.'s names to check that they were still there.  When Elliott fell asleep for a longer period, Brager and B. ran to Brager's car and escaped from the house.

Brager testified that she did not initially report what had happened to the police because she felt responsible for the events, considering she had a protection order against Elliott.  Brager also stated Elliott had brainwashed her into thinking that his actions were her fault, delaying her reporting.

During Brager's testimony, the State sought to admit the April 28 text messages that Elliott sent her.  After authentication by Brager, the text messages were admitted.  Elliott's messages stated:

Good, bring [Connor] out to help me for a[ ]little bit.  Could use his muscles[.]

And a BIG F[*]CK YOU TOO!!

Listen, I'm sorry I'm grumpy lately!  It just seems I've been getting stepped on a lot lately.  Plus when [you're] late or don't answer that pretty much tells me that you really don't care.  If you only knew what it feels like to not have your son in your life, I try like h[*]ll and he just don't give a f[*]ck about me!!  There's nothing more I can do, it is what it is I guess.  Honestly[,] I'm ready to get the f[*]ck out of here, sick of this co-parenting and Salinger house bull sh[*]t and my job.  I hate it all and ready for my life.  Anyways, sorry for the rude comments.

Suppl. Clerk's Papers, Ex. 2.  The trial court also admitted other text messages exchanged between Brager and Elliott following the events in July and photographs of Brager's bruised neck as additional exhibits.

B. also testified at the trial. Her testimony was consistent with Brager's testimony about the July assault events, including Elliott dragging Brager to his basement, preventing her from leaving the house, holding Brager by the throat, and threatening Brager with the woodworking tool.

At the close of evidence, Elliott's counsel did not renew his motion to sever count IV. The jury found Elliott guilty of all four of the charged counts.

Elliott appeals.

## ANALYSIS

Elliott makes two arguments related to his counsel's motion to sever count IV (violation of a court order). First, he argues the trial court erred when it denied his pretrial motion to sever. Second, he argues he received ineffective assistance of counsel when his counsel failed to renew the motion to sever at the close of evidence. We reject both arguments.

I. LEGAL PRINCIPLES

A. SEVERANCE OF COUNTS UNDER THE CRIMINAL RULES

The criminal rules address joinder and severance of claims and parties. CrR 4.3(a) provides that the State may join two or more offenses into one charging document when the offenses are "of the same or similar character, even if not part of a single scheme or plan" or "based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." CrR 4.3(a). The criminal rules address severance in CrR 4.4(b) (Severance of Offenses), which states:

> The court, on application of the prosecuting attorney, or on application of the defendant . . . shall grant a severance of offenses whenever before trial or during

6

trial with consent of the defendant, the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense.

"Severance of charges is important when there is a risk that the jury will use the evidence of one crime to infer the defendant's guilt for another crime or to infer a general criminal disposition." *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). "To determine whether to sever charges to avoid prejudice to a defendant, a court considers '(1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.' " *Id.* at 884-85 (quoting *State v. Russell*, 125 Wn.2d 24, 63, 882 P.2d 747 (1994)).

It may be appropriate to deny severance even if not all four of the factors are met. *See State v. Bythrow*, 114 Wn.2d 713, 720-23, 790 P.2d 154 (1990) ("[T]he fact that separate counts may not be cross[-]admissible does not necessarily represent a sufficient ground as a matter of law [to sever the offenses]."). "A defendant 'seeking severance ha[s] the burden of demonstrating that a trial involving [all] counts would be so manifestly prejudicial as to outweigh the concern for judicial economy.' " *State v. Slater*, 197 Wn.2d 660, 676, 486 P.3d 873 (2021) (alterations in original) (quoting *Bythrow*, 114 Wn.2d at 718).

When a pretrial motion to sever is denied by the trial court, the motion may be renewed before or at the close of evidence. CrR 4.4(a)(2). But "[s]everance is waived by failure to renew the motion." CrR 4.4(a)(2).

B. INEFFECTIVE ASSISTANCE OF COUNSEL

To show ineffective assistance of counsel, the appellant must demonstrate that their counsel's performance was deficient and the deficient performance prejudiced the appellant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013). Failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 700.

To show prejudice, the appellant must demonstrate a reasonable probability that the outcome of the proceeding would have been different if counsel had not performed deficiently. *State v. Johnson*, 12 Wn. App. 2d 201, 210, 460 P.3d 1091 (2020), *aff'd*, 197 Wn.2d 740, 487 P.3d 893 (2021).

When a defendant argues ineffective assistance of counsel related to a failure to move for severance, the defendant must show that (1) the motion to sever would have been granted *and* (2) he would have been acquitted of the charges in separate trials.[1] *Sutherby*, 165 Wn.2d at 884.

II. FAILURE TO RENEW MOTION TO SEVER WAIVED ARGUMENT ON APPEAL

Elliott argues that the trial court erred when it denied his pretrial motion to sever the violation of a no-contact order count from the other counts.

---

[1] *See also State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012) (In cases of joinder of multiple defendants, the defendant demonstrates prejudice for ineffective assistance of counsel by showing "[(1)] a competent attorney would have moved for severance, [(2)] that the motion likely would have been granted, and [(3)] that there is a reasonable probability he would have been acquitted at a separate trial.").

However, as noted above, when a pretrial motion to sever is denied by the trial court, it must be renewed by the close of evidence or the issue is waived. CrR 4.4(a)(2). Here, Elliott's counsel did not renew his initial motion to sever. As a result, Elliott has waived appeal of the trial court's denial of his motion to sever.

### III. ELLIOTT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL

Elliott next argues that he received ineffective assistance of counsel because his counsel did not renew his motion to sever at the close of evidence.

Assuming, without deciding, that Elliott's counsel was deficient for failing to renew his motion to sever,[2] Elliott must still show prejudice by showing both that a motion to sever was likely to be granted and the jury would not have found him guilty in separate trials.

To show the motion to sever would have been granted had it been renewed at the close of the evidence, Elliott concentrates on two of the four factors for prejudice: factor one (strength of State's evidence on each charge) and factor four (cross admissibility of the evidence).

### A. STRENGTH OF STATE'S EVIDENCE FOR COUNTS I, II, AND III

With respect to factor one, Elliott argues that because of the weakness of the State's evidence, the jury relied on the April text messages to convict him of the counts related to the July events. The State responds that each count related to the July assault was clearly proven by strong evidence and not by the April text messages. The State's position is persuasive.

---

[2] The State agrees with Elliott that his counsel's failure to renew the motion to sever count IV from the other counts was deficient, but argues that Elliott cannot show prejudice.

For this factor, severance is proper "when one case is remarkably stronger than the other." *State v. MacDonald*, 122 Wn. App. 804, 815, 95 P.3d 1248 (2004), *review denied*, 153 Wn.2d 1006 (2005).

Looking separately at each count, there is strong supportive eyewitness testimony. For count I, the second degree assault charge, the State was required to prove that Elliott intentionally assaulted Brager by strangulation or suffocation. RCW 9A.36.021(1)(g). This count was supported by both Brager's detailed testimony that Elliott held her by her throat and she could not scream or breathe, as well as B.'s corroborative eyewitness testimony.

For count II, felony harassment—threat to kill, the State was required to show that Elliott knowingly threatened to kill Brager immediately or in the future, Elliott's words placed Brager in fear that Elliott's threat would be carried out, and Elliott acted unlawfully in his harassment of Brager. RCW 9A.46.020(1)(a)(i), (2)(b). For this charge, Brager testified that Elliott told her he was going to kill her while wielding a blade-like woodworking tool in his hands. Brager also testified she believed Elliott's threat when he held her by the neck such that she was unable to breathe. B.'s testimony was also directly supportive of these facts, including Elliott's use of the woodworking tool.

Finally, for count III, unlawful imprisonment, the State was required to show that Elliott knowingly restrained Brager by restricting her movement without her consent, the restriction substantially interfered with Brager's liberties, and Elliott did not have the legal authority to restrain Brager. RCW 9A.40.040; 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 39.16 (5th ed. 2021). Again, through Brager's firsthand account of the assault, including Elliott forcibly pulling her into his basement and preventing her from leaving

until he fell asleep, together with B.'s testimony supporting Brager's version of the assault, the evidence on this count was strong.

Viewed separately, the evidence on each of these counts was strong. As shown below, the April text messages were not irrelevant to these counts, but the language used in the actual text messages makes the messages unlikely to be misused by the jury to inappropriately find a propensity for assault, harassment, or imprisonment. In the face of such strong eye-witness testimony from Brager, Elliott cannot show that factor one indicates a motion to sever would have been granted.

B. CROSS ADMISSIBILITY OF TEXT MESSAGES FOR OTHER CHARGES

Elliott also argues that factor four, cross admissibility, supports his position. Elliott contends that if the trial court had conducted an ER 404(b) analysis, it would have determined that the text messages were more prejudicial than they were probative for counts I, II, and III and, therefore, would not have been cross-admissible. The State argues the opposite, that the April text messages would have been cross-admissible for Elliott's other charges, in part, because the messages would help the jury understand Brager's delay in reporting.

To assess cross admissibility, the trial court should typically consider whether, under an ER 404(b) analysis, the evidence of each charge would be admissible in separate trials if severance was, or had been, granted. *Slater*, 197 Wn.2d at 677. ER 404(b) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." An ER 404(b) analysis requires the trial court to conduct a four-part test:

"(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."

*State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Thang,* 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

The text messages pass ER 404(b)'s four-part test.[3] First, it is undisputed that the text messages were actually sent to Brager from Elliott. For the second and third elements, the text messages and evidence of the violation of a court order would be relevant to the history between Elliott and Brager and the reasonableness of Brager's fear for count II, felony harassment—threat to kill. *See State v. Riley*, 12 Wn. App. 2d 714, 722, 460 P.3d 184, *review denied*, 195 Wn.2d 1031 (2020) (evidence of prior bad acts that showed reasonableness of the victim's fear for telephone harassment charge were relevant and admissible). In addition, the evidence would have been relevant to Brager's reasoning for her delayed report to the police. *See State v. Fisher*, 165 Wn.2d 727, 744-46, 202 P.3d 937 (2009) (evidence of prior bad acts was admissible to show why the victim delayed reporting when delayed reporting was an issue in the case). During the trial, Brager explained that she felt responsible for the assault when there was a no-contact order in place. Accordingly, the no-contact order and text messages are relevant to, and support, this testimony.

For the final part of the ER 404(b) test, the text messages are not highly prejudicial to Elliott compared to their probative value. The text messages only show Elliott cursing at and then apologizing to Brager and were not overly violent in nature. When that minimal prejudice is

---

[3] Elliott argues that the court's failure to conduct an ER 404(b) analysis to determine whether the text messages were overly prejudicial warrants a new trial. But as stated above, Elliott has waived any argument that the trial court erred related to severance.

weighed against the probative value of showing the relationship between Brager and Elliott to partially explain the reasonableness of Brager's fear and delay in reporting, the text messages were more probative than prejudicial. Thus, the text messages would have passed an ER 404(b) analysis to be cross-admissible.

Because the State's evidence on all counts was strong and the text messages would have been cross-admissible, Elliott cannot show that a motion to sever, had his counsel renewed the motion at the close of testimony, would have been granted, much less that the outcome of separate trials would have been different.[4] Elliott's ineffective assistance of counsel claim fails because he cannot satisfy the prejudice prong.

CONCLUSION

Elliott's challenge to the trial court's denial of his motion to sever has been waived, and his ineffective assistance claim fails because he has not shown he was prejudiced by any deficient performance. We affirm Elliott's convictions.

---

[4] Elliott makes no attempt in his briefing to argue that severance would have resulted in acquittals in separate trials. *See Sutherby*, 165 Wn.2d at 884 (prejudice for ineffective assistance requires both that the motion to sever would have been granted and that the defendant would have been acquitted in separate trials). However, because we decide Elliott has not made the initial showing that a renewed motion would have been granted, we do not further address this issue.

No. 56561-7-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

VELJACIC, J.